Donald **WENDT**, Respondent/Cross Appellant,

v.

**GENERAL ACCIDENT INSURANCE COMPANY,** Appellant/Cross Respondent.

Nos. 63503, 63510.

Missouri Court of Appeals, Eastern District, En Banc.

Feb. 21, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 20, 1995.

Application to Transfer Denied April 25, 1995.

Eugene K. Buckley, John S. McCollough, Evans & Dixon, St. Louis, for appellant.

Matthew J. Padberg, James P. Leonard, Padberg, McSweeney, Slater & Merz, St. Louis, for respondent.

PUDLOWSKI, Judge.

Donald Wendt (husband) was involved in a collision with an underinsured motorist. Husband's insurance carrier, General Accident Insurance Co., appeals from a decision in favor of husband on his claims for damages and loss of consortium against the underinsured motorist provisions of his insurance policy. It raises, among other issues, the question whether Betty Wendt's (wife's) past suit for her own injuries should estop husband from relitigating issues decided in her case. Husband cross appeals the trial court's reduction of his award by 40% for his comparative fault and by an additional sum for the settlement he received from the underinsured motorist. We modify the judgment and, as modified, affirm.

This case comes before this writer as the result of a rehearing by the Court *en banc*. With permission, portions of the prior opinion have been incorporated without attribution. Husband was driving, with his wife as passenger, north on Germania Street across Gravois in St. Louis City. South of the intersection, the northbound side of Germania is four lanes wide, consisting of a right turn lane (to turn east on Gravois), two through lanes, and a left turn lane (to turn west on Gravois). Husband was proceeding north in the through lane nearest the center of the road. He was following one car length behind another vehicle. North of the intersection, Germania's name changes to Hampton and makes a noticeable bend to the right.

The underinsured motorist was proceeding southbound on Hampton in the left turn lane, intending to make a left turn onto eastbound Gravois. The underinsured motorist acknowledged his duty to yield to oncoming traffic while making a left turn under the green light. Testimony by the underinsured was by deposition and was read at trial. As he approached the intersection he asserted that he was slowing down, but still rolling, when he looked down to shift. The two vehicles then collided. Neither driver saw the other's vehicle before impact.

However, the wife, who was a passenger in the northbound (husband's) vehicle, testified that she saw the underinsured driver's car, with its headlights on, turning into their car in the middle of the intersection. She screamed, "he's going to hit us." The impact was severe, and caused considerable injuries to husband and wife. A police officer testified that the underinsured driver told him after the accident that the crash happened "as he was turning."

The driver turning left held an insurance policy with liability limits of only $50,000 per person, and $100,000 per occurrence. Husband and wife filed separate suits against their own insurance company, General Accident, to compel them to honor the $500,000 underinsured motorist coverage in their policy. Husband and wife each then settled with this underinsured driver for the liability limits of $50,000 in his policy.

General Accident requested that the trial court consolidate the two suits, but the trial court refused. Wife's cause went to trial first. She sought compensation for her personal injuries and for loss of consortium by reason of her husband's injuries. The jury found against her and for General Accident. The trial court overruled all post-trial motions and she took no appeal.

Shortly after the verdict in the wife's case, General Accident filed an amendment to its answer in husband's case, which was still pending trial, raising the issues of collateral estoppel and comparative fault. Husband's case then went to trial. The trial court refused to apply collateral estoppel to avoid relitigating issues already decided at the wife's trial. Yet, it instructed the jury on comparative fault, based on the theories that husband was on the wrong side of the road, and that husband failed to keep a proper lookout. The jury found for husband, awarding him $217,500 for his personal injuries and $50,000 for his loss of consortium by reason of his wife's injuries. However, it also apportioned 40% of the fault to husband.

General Accident moved that the trial court further reduce the award by $50,000 for amounts collected by husband in his settlement with the underinsured driver, and by another $50,000 for amounts collected by his wife in her settlement with the underinsured driver. The trial court sustained the reduction of the award by $50,000 for husband's previous settlement with the underinsured driver, but declined to reduce the award by another $50,000 for the wife's settlement. According to our computation, therefore, the final judgment entered by the trial court was for $110,500:

| | | |
|---|---|---|
| $ | 217,500 | Husband's personal injuries |
| + $ | 50,000 | Loss of consortium |
| $ | 267,500 | |
| − $ | <107,000> | Less 40% comparative fault |
| $ | 160,500 | |
| − $ | <50,000> | Settlement with underinsured |
| $ | 110,500 | Total award |

General Accident then appealed the judgment. It alleged that the trial court erred in refusing to apply the doctrine of collateral estoppel to avoid relitigating issues already decided in the wife's previous trial. It also alleged that the trial court erred in ruling that husband had introduced enough evidence to make a submissible case on the underinsured's failure to yield, failure to keep a careful lookout, and driving on the wrong side of the road.

Husband cross appealed that the trial court erred in instructing the jury on comparative fault because no substantial evidence supported the theories that he was on the wrong side of the road and that his failure to keep a lookout proximately caused the accident. He also alleged that the trial court erred in reducing his verdict by the $50,000 already paid to him as settlement for his claim against the underinsured motorist.

### General Accident's Appeal

■ Upon rehearing, we deem that the trial court was correct in its decision not to collaterally estop husband's claims, both for his own injuries and for his loss of consortium due to his wife's injuries. When considering the appropriateness of applying collateral estoppel in a given case, a court should consider:

(1) whether the issue decided in the prior adjudication is identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; and (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication. *Oates v. Safeco Ins. Co. of America,* 583 S.W.2d 713, 719 (Mo. banc 1979).

Above all, it should consider whether the party against whom collateral estoppel is asserted had a "full and fair opportunity to litigate the issue in the prior suit," for "fairness is the overriding consideration." *Id.*

■ Neither of husband's claims should be barred as the result of his wife's failed suit. Husband, although he was a testifying witness at his wife's trial, was not a party to that proceeding. Nor was he in privity with her. Missouri has long ago eschewed the concept of privity founded solely upon marriage. Wives are not bound to judgments against their husbands, and *vice versa. Womach v. City of St. Joseph,* 201 Mo. 467, 100 S.W. 443, 446 (1907). Nor can we infer privity between two people merely because they both have an interest in proving or disproving the same set of facts, share the same attorney, testify for each other, or sustain injuries in the same vehicle. *Steinhoff v. Churchill Truck Lines, Inc.,* 875 S.W.2d 175, 177 (Mo.App.E.D.1994). Husband in this action is not in legal privity with his wife by estate, contract, or otherwise. Thus, barring husband's personal injury and consortium claims would violate the third prong of *Oates.*

■ However, General Accident maintains that at least the loss of consortium claim should be barred because husband's claim is derivative of wife's claim. We disagree. While it is often said that a consortium claim is "derivative," *see, e.g., Burrow v. Moyer,* 519 S.W.2d 568, 572 (Mo.App.1975), it is also said that a claim for loss of consortium is "separate and distinct" from the spouse's claim for her injuries, *Marusic v. Union Electric Company,* 377 S.W.2d 454, 459 (Mo. 1964), and that they are "two independent causes of action," *Garland v. American Family Mutual Insurance Co.,* 458 S.W.2d

889, 891 (Mo.App.1970). We believe that these statements are best reconciled by the view that a consortium claim is a separate, distinct, and personal legal claim, and is derivative only in the sense that it must be occasioned by a spouse's injury. *See Peeples v. Sargent,* 77 Wis.2d 612, 253 N.W.2d 459, 471 (1977).

In *Womach, supra,* a case squarely on point with the present facts, the Supreme Court of Missouri held that a wife's failure to prevail in a separate suit for her own personal injuries *does not bar* a husband's subsequent suit for *his* loss of consortium by reason of her injuries. When a spouse is injured, the other spouse suffers. Each spouse bears a separate real loss, and each should be afforded an opportunity to seek redress for that loss in the way that he or she sees fit. We note that there is a current trend in some, but by no means all, foreign jurisdictions tending to oppose the result of *Womach. See* Restatement (Second) of Judgments '§ 48, cmt. c (1982). However, the pronouncements of foreign courts and commentators carry no precedential value, and we are bound by the long standing Supreme Court precedent of *Womach.*

The minority opinion argues that Rule 66.01(c),[1] effective July 1, 1965, changes the *Womach* result. We acknowledge that this Rule can compel negligence and consortium claims to be tried together in certain circumstances. However, none of those circumstances attend this case.

> Rule 66.01(c) ... makes the joint filing procedure mandatory in two instances: (1) if notice is given, or (2) if both spouses have ever been coparties *and in these two instances only.* (Our emphasis).

*Cline v. Carthage Crushed Limestone Company,* 504 S.W.2d 118, 119 (Mo.1974).

The notice must be "written notice," Rule 66.01(c), and must be served either personally with proof by return of the officer or affidavit, or by registered or certified mail with a return signed by the addressee, Rule 66.01(d).[2] General Accident never alleged that it gave proper notice to husband. In fact, Rule 66.01 never appears in any briefs to this Court or in the record, and it is not the duty of this Court to act as an attorney for the parties. *Thummel v. King,* 570 S.W.2d 679, 686 (Mo. banc 1978). To our knowledge, General Accident has not availed itself of Rule 66.01, and the record bears no evidence of proper compliance with the notice provision.

Nor have husband and wife ever been co-parties to each other's cases. In this case, husband chose to remain a complete stranger to his wife's action. Motions to consolidate were overruled.

In light of the Supreme Court's pronunciation in *Oates, supra,* fairness should be the ultimate consideration in collateral estoppel cases. General Accident apparently never gave notice under the Rule, and husband and wife never voluntarily joined as co-parties. By providing a separate notice provision, Rule 66.01 implicitly recognizes that it would be unfair to completely bar a spouse's action without giving him or her prior actual notice of this harsh possibility. " 'It is also a most obvious principle of justice that no man ought to be bound by proceedings to which he was a stranger....' " *Womach,* 100 S.W. at 445, *quoting* 1 Greenl. on Ev. § 523 (16th ed.). We deem that the trial court properly afforded husband his fair day in court for his separate and distinct losses in accordance with Supreme Court precedent. General Accident's points on appeal with respect to collateral estoppel are, therefore, denied.

General Accident next contends that the trial court erred in denying its motion for directed verdict because husband failed to make a submissible case. General Accident claims that there is no evidence of the underinsured motorist's negligence in failing to yield the right-of-way, failing to keep a careful lookout, and driving on the wrong side of the road. Separately, General Accident attacks the court's submission of these theories in the disjunctive. We have reviewed the transcript and find that there was substantial evidence to support each of the specifications of negligence in husband's instruction as sub-

---

**1.** As of January 1, 1995, Rule 66.01(c) was renumbered as Rule 66.01(d).

**2.** As of January 1, 1995, Rule 66.01(d) was renumbered as Rule 66.01(e).

mitted. However, extended discussion of these fact intensive issues would be of no precedential value. We deny these points pursuant to Rule 84.16(b).

■ General Accident next asserts that Instruction No. 8 confused and misled the jury by obscuring the fact that the liability of General Accident depended on husband being legally entitled to recover from the underinsured motorist. We hold that any ambiguity caused by Instruction No. 8 was cured by the converse instruction, Instruction No. 9, which stated:

In your verdict you must not assess a percentage of fault to General Accident Insurance Company unless you believe Steven Webb's conduct was negligent as submitted in Instruction No. 8.

This converse instruction made clear to the jury that they were not to assess a percentage of fault to General Accident unless they found Webb (the underinsured motorist) negligent. Point denied.

■ Finally, General Accident contends that the trial court erred by not reducing husband's verdict by an additional $50,000 for funds received by his wife from the underinsured motorist. As stated earlier, we hold that husband's cause of action is distinct from hers. Any funds received by wife in settlement for her cause of action in no way affects husband's cause of action or rights under the policy. Under the policy, husband remains "legally entitled to recover" from the underinsured for his distinct claims (and, therefore, from General Accident) even after the underinsured's settlement with his wife for her distinct claims. Point denied.

*Cross Appeal*

We now address husband's points on cross appeal. First, husband alleges that it was error to submit a comparative fault instruction because there was no substantial evidence to support the theory that husband was on the wrong side of the road, or that his alleged failure to keep a careful lookout was a contributing cause to the accident. We agree with this point.

■ A comparative fault instruction is not warranted in every negligence suit.

Rather, the defendant bears the burden of producing evidence to support the instruction. *Finninger v. Johnson*, 692 S.W.2d 390, 393 (Mo.App.E.D.1985). While the instruction may be based on any theory supported by the evidence as construed most favorably to defendant, it must be based on "substantial evidence," and not merely a "scintilla of evidence, or speculative deductions and conclusions." *Id.*

■ As to the "wrong side of the road" theory, General Accident claims that this is supported by the relative positions of the vehicles after the crash. However, mere evidence of the positions of vehicles after a crash raises conflicting inferences, and does not make a submissible case. *Bentley v. Crews*, 630 S.W.2d 99, 102 (Mo.App.1981). Likewise, the damage to the left and front sides of both cars raises equally conflicting inferences in this case, and therefore carries no substantial probative value.

No other evidence was introduced from which the jury could infer that husband was on the wrong side of the road. The other driver does not remember the accident, nor does he even remember seeing husband and wife's car before impact:

Q Where was the other car when you first saw it?

A Stopped—You mean after the accident?

Q Yes. Well, did you ever see it before the accident?

A No. I never seen, heard nothing. [sic]

As far as the position of his own car before the crash, the underinsured's deposition does say that he was moving forward, not to the left. Yet, we do not regard this evidence to be sufficient to support the instruction. Even in the most favorable light, statements by a driver about his position in the road do not carry substantial weight where that driver admits that he was not even looking at the road:

Q And the last you remember is putting your car in neutral?

A Yes, sir. I remember looking down and pushing my stick shift into neutral and then that's the last thing I remember.

The minority opinion suggests that even though the underinsured driver was not looking at the road at the time of the accident, his statement about where he was is reliable because "a driver can be expected to know whether he has turned the steering wheel and can quite often sense a change in direction by sensation or peripheral vision." We disagree.

No evidence was introduced by General Accident as to the position of the steering wheel, the driver's· sensations, or his peripheral vision. As mentioned above, an instruction must be based upon *substantial* evidence, not merely a scintilla of evidence or speculative deductions. *Finninger, supra.* The minority's account of how the underinsured driver knew his precise position in the road when he was "glancing down" is an exercise in pure speculation. Furthermore, even if the underinsured driver had testified about his sensations and peripheral visions, we would be unlikely to consider them substantial evidence. Whether an instruction is supported by substantial evidence is a question of law, therefore, this analysis does not invade the province of the jury.

Other evidence cited by the minority does not meet the substantial evidence standard. The fact that the road was curved raises no substantial inference that the car on the inside of the curve crossed the center line. Otherwise, every curve in every road would support an instruction in favor of the driver in the outside lane.

Nor do husband's statements on direct examination that he was "following" a line of traffic "straight onto Hampton" and not right or left, create a substantial inference that he failed to negotiate the turn. In answering the "right or left" question, husband also said that he never varied from his lane of travel: "Q Did you ever vary from that lane [of] travel, ever go right or left? A No, sir." He also said that the line of cars which he was following went "straight ahead."

The minority's argument is, in effect, that husband meant that he went absolutely straight, not right or left, through a curved intersection, taking him out of his lane. The majority is not persuaded by this semantic play on the terms "straight" and "right or left." No jury should be allowed to find that by "straight onto Hampton" and not "right or left" husband meant that he went absolutely straight, heedless of the shape of his lane, when in the same breath he said he was following a line of traffic, also going "straight," and never varying from the lane. A jury is only entitled to make reasonable inferences based on substantial evidence. General Accident simply did not meet its burden to produce substantial evidence at trial to support the "wrong side of the road" instruction.

The "failure to keep careful lookout" portion of the instruction was also unsupported by substantial evidence. The party seeking this instruction bears the burden to show that the other party, had he been keeping careful lookout, could have reacted in time to avoid the accident. *Thurman v. Anderson,* 693 S.W.2d 806, 807–08 (Mo. banc 1985). Although there was evidence that husband had a lane open to his right, General Accident averred nothing to prove that there was sufficient *time* to react between the moment when husband should have realized the danger, and the moment of collision. This time factor is crucial to the propriety of an instruction on failure to keep a lookout. *Id.* General Accident did not meet its burden to supply substantial evidence that husband would have had *time to avoid the collision* had he been keeping a careful lookout. We are not persuaded by the minority's argument that a car travelling 20–25 m.p.h. over the distance of one car's length shows "ample time" to take evasive action. Since neither branch of the comparative fault instruction was supported by substantial evidence, we find in favor of husband on this point.

█ Husband also contends on cross appeal that the trial court erred in reducing the verdict by the $50,000 he received from the underinsured motorist because such a reduction conflicts with the language of the insurance policy. Husband wishes us to infer that it was error to offset his settlement against his actual damages because the contract says

only that there should be a set-off against the upper limit of liability. We disagree.

The provision cited by husband pertains solely to the upper limit of liability and does not address General Accident's obligation to pay. Rather, the obligation to pay is set forth in a separate provision:

> We will pay damages which a **covered person** is legally entitled to recover from the owner or operator of an **underinsured motor vehicle** because of bodily injury:
> 1. Sustained by a **covered person;** and
> 2. Caused by an accident. . . .
>
> We will pay under this coverage only after the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

Under these terms, General Accident is only bound to pay "damages which [husband] is *legally entitled to recover.*" (emphasis added).

We find that husband is not "legally entitled to recover" from the underinsured motorist any funds already received by him in settlement. Therefore, General Accident is not bound to pay the sum corresponding to the settlement. General Accident's obligation to pay does not arise until exhaustion of the tortfeasor's policy by judgment or settlement. Accordingly, at the time when General Accident's obligation is determined, the insured is no longer "legally entitled to recover" amounts already received. Thus, it would be improper to award husband an amount from General Accident which he is no longer entitled to recover from the tortfeasor.

Any other construction would conflict with the underlying purpose of underinsured motorist coverage—to place the insureds in the position they would have been in had the tortfeasor been adequately insured. *See* Alan I. Widiss, Uninsured and Underinsured Motorist Insurance § 41.7, at 95 (2d ed. 1992).

Husband's interpretation would result in a windfall to him by permitting recovery of the full amount of the tortfeasor's policy plus the full amount of his damages from his own carrier. Such a result cannot be reconciled with the language of the policy or the purpose of underinsured motorist coverage. Point denied.

For the aforementioned reasons we hold that it was error to have submitted the comparative fault instruction to the jury. Pursuant to Rule 84.14 the judgment is modified to provide for damages to husband in the amount of $267,500 reduced by $50,000 for his settlement with underinsured but with no reduction for comparative fault. *See Robinson v. Weinstein,* 856 S.W.2d 337, 338 (Mo. App.E.D.1993). We affirm the judgment of the trial court in all other respects.

Judgment affirmed as modified.

REINHARD, SIMON, KAROHL, GARY M. GAERTNER, WHITE, and DOWD, JJ., concur.

CRAHAN, J., concurs in part and dissents in part, in separate opinion, joined by GRIMM, C.J., and SMITH, CRANE, and AHRENS, JJ.

CARL R. GAERTNER, J., concurs in part and dissents in part, with separate opinion.

CRAHAN, Judge, concurring in part and dissenting in part.

I concur in the majority opinion except for its disposition of plaintiff's consortium claim and defendant's comparative fault claim.

*Plaintiff's Consortium Claim*

Although they are lumped together in the majority's analysis of defendant's collateral estoppel contentions, there are key differences between plaintiff's claim for his own injuries and his claim for loss of his wife's consortium that compel different results.

Plaintiff's claim for his own injuries cannot be barred by collateral estoppel by reason of the adverse judgment in his wife's prior suit because two of the elements required for collateral estoppel are missing. Defendant concedes that plaintiff was not a party to his wife's suit and, as the majority correctly holds, the mere fact that he is married to a party is insufficient to establish privity. Majority Opn. at 213; *see generally* 18 Charles A. Wright, Arthur R. Miller, Edward H.

Cooper, Federal Practice and Procedure § 4459, at 522–24 (1981). Nor was the issue of the other driver's negligence *necessarily* decided in wife's prior suit. Although the jury *may* have determined that Webb was not negligent, such finding was not essential to the verdict. The jury *may* have determined that the other driver (Webb) was negligent but his negligence was not the proximate cause of any injury to wife. Collateral estoppel may only be applied to those issues that were necessarily and unambiguously decided in the prior suit. *King Gen. Contr. v. Reorganized Church,* 821 S.W.2d 495, 501 (Mo. banc 1991). Accordingly, collateral estoppel cannot properly be applied to bar plaintiff's claim for his own injuries.

In contrast, the elements of collateral estoppel are satisfied with respect to plaintiff's claim for loss of his wife's consortium. Privity exists as to this claim not by reason of the marital relationship but by reason of the fact that plaintiff's claim derives from wife's right to recover for her own injuries. Just as a grantee or assignee is considered in privity with and may properly be held bound by a determination adverse to his grantor or assignor from whom his rights are derived, so too a spouse's claim for loss of consortium is derivative in nature and cannot exist in the absence of a viable claim on the part of the injured spouse to recover for her own injuries. Although the claims are independent, separate and distinct in the sense that they seek redress for separate and distinct types of damage, both claims are necessarily dependent upon the injured spouse's right to recover from the defendant for her own injuries. Thus, where a jury has already determined that the injured spouse has no viable claim, it is not sensible to permit the other spouse to recover for loss of consortium.

Explicit recognition of the unique and derivative nature of consortium claims justifying the conclusion that the privity requirement is satisfied can be found in Rule 66.01(c), which became effective on July 1, 1965. At the time of trial, Rule 66.01(c) provided: [1]

**(c) Consolidation—Injury to Spouse.** If an injury not resulting in death is inflicted upon the person of one spouse, and causes of action therefor accrue to the injured spouse and also to the other spouse for loss of consortium or services or medical expenses, they shall be enforced in one action by both spouses if they have ever been co-parties in such action or if notice is given.

If any party against whom a claim is asserted gives written notice of the pendency of the action and of the necessity to join therein to the spouse whose claim was not joined, the claim of such spouse shall be barred unless the spouse makes application to be added as a party therein within thirty days after such notice. The spouse so required to join shall have an unconditional right to be added as a party pursuant to Rule 52.06.

With the adoption of Rule 66.01(c), cases such as *Womach v. City of St. Joseph,* 201 Mo. 467, 100 S.W. 443 (1907), and the dicta in *Marusic v. Union Electric Company,* 377 S.W.2d 454, 459 (Mo.1964), relied upon by the majority, should no longer be deemed controlling. The principal rationale for the rule articulated in *Womach,* i.e., that the causes of action for personal injuries and loss of consortium were so distinct they could not properly be joined in one action[2], is squarely overturned by the grant of an unconditional right of joinder in Rule 66.01(c).

Although General Accident has not cited or discussed Rule 66.01(c) in its brief, it has urged, and the minute entries from both cases reflect, that motions to consolidate were filed in both cases and overruled by the court. Contrary to the majority opinion, in view of the provisions of Rule 66.01(c), a consortium claimant is no longer to be "afforded an opportunity to seek redress for that loss in the way that he or she sees fit."

---

**1.** This Rule was amended effective January 1, 1994, but the changes are not material to any issue involved in this appeal.

**2.** *Womach,* 100 S.W. at 448, 449. Further, *Womach* did not consider or discuss the derivative nature of the claims, a proposition first acknowledged by the Missouri Supreme Court in *Huff v. Trowbridge,* 439 S.W.2d 493, 498 (Mo. 1969).

Majority Opn. at 214. Rather, upon notice by the defendant of the necessity of joining in the personal injury suit, the spouse asserting the consortium claim must join in the action or be barred from pursuing the claim. *Garland v. American Family Mutual Insurance Co.,* 458 S.W.2d 889, 892–93 (Mo.App. 1970).

Even in the absence of such express provision barring separate assertion of the consortium claim regardless of the outcome of the personal injury suit, a consortium claimant who actively resists consolidation should not be heard to complain of the bar of collateral estoppel by reason of an adverse judgment in the spouse's suit. Given the unconditional right of joinder provided by Rule 66.01(c), the consortium claimant has unquestionably had a "full and fair *opportunity* to litigate the issue in the prior suit," as contemplated for the application of collateral estoppel. *Oates v. Safeco Ins. Co. of America,* 583 S.W.2d 713, 719 (Mo. banc 1979) (emphasis added). *See also* Restatement (Second) of Judgments § 48, Reporter's Note to cmt. c, at 33 (1982)[3]. Accordingly, I would reverse the judgment in plaintiff's favor on Count II for loss of consortium.

### *Submission of Comparative Fault*

In reviewing the submissibility of a comparative fault instruction, we are obliged to consider all of the evidence in the light most favorable to the instruction and to give the defendant the benefit of any favorable inferences. *Berra v. Union Elec. Co.,* 803 S.W.2d 188, 190 (Mo.App.1991). The plaintiff's evidence must be disregarded unless it tends to support the grounds of comparative fault submitted in the instruction. *Id.* The majority's analysis does not comport with these well-established requirements.

To properly analyze the evidence supporting defendant's comparative fault submission, it is essential to understand the physical layout of the intersection. The accident occurred where Germania/Hampton Avenue crosses Gravois. For convenience, most of the witnesses characterized Gravois as an east/west street with Hampton joining the intersection on the north and Germania joining the intersection on the south.[4] However, from the photographs introduced at trial it is clear that Hampton intersects with Gravois at an appreciable angle. In fact, plaintiff's exhibits no. 4, a view from the west side of Hampton looking south directly down Germania, and no. 5, a view from the west side of Germania looking north down Hampton, clearly shows that a car traveling north on Germania in the lane used by plaintiff would run directly into the southbound left turn lane on Hampton where Mr. Webb was located unless the driver veered to the right as he exited the intersection northbound onto Hampton. Copies of these two exhibits are attached.

Significantly, throughout his testimony, plaintiff consistently maintained that he was following the line of traffic in front of him "straight through Gravois." Plaintiff was specifically asked, "Did you ever vary from that lane ever travel, [sic] ever go right or left?" to which he replied, "No, sir." Although neither plaintiff nor his wife had any recollection of the impact and the precise point of impact was never established, both testified that they were more than halfway through the intersection when wife called out her warning and the accident occurred.

From the photographs in evidence, it is clear that it is at a point just over halfway through the intersection that a pronounced

---

**3.** The Restatement (Second) of Judgments § 48(2) (1982) provides:

When a person with a family relationship to one suffering personal injury has a claim for loss to himself resulting from the injury, the determination of issues in an action by the injured person to recover for his injuries is preclusive against the family member, unless the judgment was based on a defense that is unavailable against the family member in the second action.

**4.** At this intersection, the streets involved do not precisely align with these directions and, in fact, although there is no confusion in the record, Mr. Webb's deposition testimony was predicated on the assumption that Gravois ran north/south and Hampton/Germania ran east/west. For the sake of clarity, this opinion treats all testimony as if the witnesses had all used the same directional orientation, treating Gravois as running east/west and Hampton/Germania as running north/south, which are also the directions used in the majority opinion.

turn to the right must be initiated in order to remain in the proper lane of travel. A turn any sooner would align the vehicle with the right northbound lane. Delaying the turn would present the risk of crossing the centerline into the southbound left turn lane occupied by Mr. Webb's vehicle. At no point in his testimony did plaintiff ever indicate that he was aware of the necessity of initiating a turn to the right. Rather, his testimony was as recounted above which, coupled with the photographs in evidence and viewed in the light most favorable to the submission, supports the inference that he failed to turn his vehicle as required by the physical layout of the intersection, crossed the centerline, and struck the Webb vehicle.

In addition to the foregoing, Mr. Webb's deposition testimony concerning the movements of his vehicle up to the point of impact further supports the inference that plaintiff, not Webb, crossed the centerline. In this testimony, read to the jury as part of plaintiff's case, Webb stated that as he approached the intersection from the north he slowed, entered the left turn lane and turned on his turn signal. Although he also had no specific recollection of the actual impact, he was quite specific about the movements of his vehicle up to the point of impact. Webb testified that he slowed his vehicle to a point where it was rolling at a speed of no more than five to ten miles per hour, glanced down at his stick shift to shift it into neutral, and felt the impact. As to the direction of movement of his vehicle just prior to impact, Webb testified:

Q. Okay. And you were moving forward?

A. Yes.

Q. Or were you moving to the left?

A. No. I was moving forward.

Once again, viewed in conjunction with the photographs of the intersection in evidence before the jury, the inference that plaintiff, not Webb, crossed the centerline and caused the accident is clear. From the photographs it is apparent that a vehicle in the southbound left turn lane of Hampton that is proceeding forward and not to the left will not cross the centerline at any point and, in fact, from the moment it enters the intersection will begin moving *away* from the centerline to the right. Thus, if the movement of Webb's vehicle was as he described it, the accident could only have occurred if plaintiff crossed the centerline. Accordingly, this specification of comparative fault was supported by the evidence and was properly submitted to the jury.

The majority dismisses Webb's testimony as insubstantial on the ground that Webb "does not remember the accident," a proposition refuted by the testimony recounted above, and with the pronouncement, unsupported by any citation to authority, that "[e]ven in the most favorable light, statements by a driver about his position in the road does not carry substantial weight where that driver admits that he was not even looking at the road." Majority Opn. at 215. Such reasoning clearly invades the province of the jury. It is not the proper function of this court to substitute our views about the proper weight to be accorded clear and unequivocal testimony by an eyewitness.

Contrary to the impression created by the majority opinion, Webb's testimony does not suggest that he was staring fixedly at his gearshift lever, oblivious to the movement of his vehicle. Webb "glanced" down at the lever to shift it into neutral while traveling no more than five to ten miles per hour. Common experience suggests that drivers frequently glance at the controls of their vehicles without losing track of their direction of travel. Even while the eyes may be diverted from the roadway, a driver can be expected to know whether he has turned the steering wheel and can quite often sense a change in direction by sensation or peripheral vision. That a driver *could* become sufficiently distracted to lose track of direction is certainly a possibility the jury would be entitled to consider in determining the weight that should be accorded Webb's testimony, but it cannot properly be said as a matter of law that Webb's ability to perceive his direction of travel was so impaired that the jury was not entitled to accord his observations substantial weight in arriving at a verdict.

It is true, as the majority observes, that mere evidence of the positions of vehicles after a crash raises conflicting inferences and does not, standing alone, make a submissible case. Defendant did not, however, rely solely on the post-accident position of the vehicles, either at trial or in this court. Defendant urged that the photographic evidence showing the obvious jog to the right, plaintiff's statements that he was proceeding straight through the intersection and Webb's testimony that he was in the left turn lane supported the inference that plaintiff failed to appreciate the necessity of veering to the right to remain in the proper lane of travel, and, due to the physical layout of the intersection, proceeded on a straight path across the center line and into the southbound left turn lane, where he collided with Webb. As discussed above, this was a reasonable inference from the evidence.

The evidence pertaining to the post-accident position and condition of the vehicles was argued to the jury as corroborating the foregoing evidence that plaintiff crossed the center line. The fact that the principal damage to both vehicles was to the left front does logically tend to corroborate defendant's theory. Likewise, the fact that all of Webb's vehicle and half of plaintiff's vehicle ended up in the southbound left turn lane on Hampton is consistent with defendant's theory. Although the post-accident position of the vehicles would not, standing alone, support the submission, such evidence was admissible and could properly be considered by the jury.

The evidence was also sufficient to support defendant's submission based on failure to keep a careful lookout. Plaintiff conceded he never saw Webb's vehicle prior to impact. The majority concludes that the evidence was nonetheless insufficient to support submission because there was no evidence to show that plaintiff would have had time to avoid the collision had he been keeping a careful lookout. The majority's analysis, however, assumes that it would have been necessary for plaintiff to change lanes to the open traffic lane on his right in order to avoid the collision. If, as the foregoing evidence suggests, the accident occurred because plaintiff, not Webb, crossed the center line, plaintiff did not need to change lanes in order to avoid the accident. *He need only have veered to the right to stay in his own lane.*

Plaintiff testified that he was proceeding straight through the intersection at least one car length behind another car at a speed of 20 or 25 miles per hour. Although given the layout of the intersection it is conceivable that his view of Webb's vehicle directly ahead may initially have been blocked by the preceding vehicle, if he was keeping a careful lookout he should have been able to see Webb's vehicle directly ahead of him with its headlights illuminated shortly after the car ahead began to veer to the right to proceed northbound on Hampton. This would have been at least a car length before the straight path travelled by plaintiff would have taken him across the center line and would have left ample time for plaintiff to initiate the required partial turn to remain in his proper lane of travel. Indeed, the fact that the preceding vehicles proceeded in the proper traffic lane without incident is itself evidence supporting submission of the instruction. *See Wellhausen v. Harris,* 654 S.W.2d 101, 103 (Mo.App.1983) (evidence that other vehicles were able to swerve into open lanes supportive of lookout instruction).

Because both specifications of the comparative fault submission were supported by substantial evidence, I would affirm the judgment as to plaintiff's comparative fault.

Plaintiff's Ex. No. 4; a view from the west side of Hampton looking south on Germania.

Plaintiff's Ex. No. 5; a view from the west side of Germania— looking north on Hampton.

CARL R. GAERTNER, Judge, concurring and dissenting.

I concur with the majority opinion in that it holds husband's claim for his own injuries was not barred by collateral estoppel and also, that his $50,000 settlement must be deducted from the judgment.

I concur with the minority opinion in that it would rule that husband's derivative claim for loss of consortium is barred because of the defeat of the primary claim for wife's injuries. I believe Missouri should adopt the Restatement (Second) of Judgements, § 48(2) (1982).

I dissent in part from each opinion.

Despite his deposition testimony, Webb told the police the collision occurred as he was turning and wife testified she saw Webb turning into their car in the middle of the intersection. This evidence supports a submission of failure to yield the right of way and of being on the wrong side of the road.

Husband testified he was driving straight through the intersection without turning right or left. Because of the offset of Hampton on the north and Germania on the south, driving straight through the intersection of necessity would cause him to be on the wrong side of the road at some point. I cannot accept the majority's argument that the terms "straight" and "not right or left" do not mean "straight" and "not right or left". There was evidence to support the submission of husband's comparative fault for being on the wrong side of the road.

However, the record is devoid of evidence tending to show when either driver could have seen the other vehicle approaching in a position of danger of collision and whether either driver had the means and ability to thereafter take successful evasive action. In *Thurman v. Anderson*, 693 S.W.2d 806 (Mo. banc 1985) the Supreme Court held the absence of evidence that a party could have avoided the accident after he or she could have seen the danger was fatal to a lookout submission.

[T]o support a contributory negligence instruction on failure to keep a careful lookout, the evidence must support a finding that a driver had the means and ability to have avoided a collision. Means and ability include sufficient time and distance considering the movement and speed of the vehicles. There was no evidence to show that either party saw the other. There was no expert evidence on how far a car will travel at various speeds before stopping. Nor was there evidence to show the distance between the vehicles at material times.

*Id.* at 807.

Similarly, in *Robinson v. Weinstein*, 856 S.W.2d 337 (Mo.App.E.D.1993) this court held a comparative fault instruction based on the plaintiff's failure to keep a lookout was erroneous because of the absence of evidence that "she should have been aware early enough for her to take defensive action that defendant would not yield the right of way, as he was required to do." *Id.* at 338.

It is argued that because husband was a car length behind the northbound car in front of him he should have seen Webb and turned into the empty lane to his right. However, this does not indicate the distance between the vehicles when Webb started to turn. Moreover, if Webb continued to turn he would still collide with husbands car as it passed in the right lane.

Accordingly, I believe the submissions of failure to keep a lookout were erroneous and I would remand to the Circuit Court for a new trial.